489 A.2d 35

Robert B. **MEDINA**, et al.

v.

**John D. MEILHAMMER.**

**No. 850, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

March 12, 1985.

240

Paul Weinstein, Baltimore, for appellants.

William J. Blondell, Jr., Baltimore (Cynthia E. Young, Baltimore, on Annapolis, the brief), for appellee.

Argued before MOYLAN, BISHOP and GARRITY, JJ.

BISHOP, Judge.

John D. Meilhammer, a minor, by Teresa M. Schuler, his mother and next friend, appellee, and Teresa M. Schuler, individually as mother of the minor, brought suit in the

Superior Court of Baltimore City (now the Circuit Court for Baltimore City) against appellants Robert B. Medina, Thomas E. Stanley and Frederick Dunn, individually, and as co-partners d/b/a Edgewater Equity Ltd. and against United Princeton Properties, Inc.[1]  After a verdict for the minor plaintiff the jury awarded him compensatory and punitive damages in the respective amounts of $400,000.00 and $300,000.00.  It is from the judgment entered thereon against all the defendants that this appeal is taken.  The case of Teresa M. Schuler, individually, and as mother of appellee was disposed of by summary judgment prior to trial.

## FACTS

The incident which is the basis for this suit happened on the grounds of the Edgewater Apartments located in Baltimore County.  The apartment complex and the land on which it is located are owned by appellants Edgewater Equity Ltd., a New Jersey Limited Partnership (Edgewater) in which Medina, Stanley and Dunn are co-partners.  The apartments were managed by appellant United Princeton Properties, Inc., a New Jersey Corporation, in which appellants Medina and Dunn were officers and/or employees.

---

1.  Sandra Hipple, a resident of Harford County and resident manager of the apartment complex, was also named as a defendant and appellants also purported to name her as a party to this appeal.  The record indicates that not only was Ms. Hipple never served but that appellee never attempted to serve her.  Consequently, the lower court never exercised its jurisdiction over her.  *See North v. Town Real Estate Corp.,* 191 Md. 212, 219, 60 A.2d 665 (1978) (service of summons is jurisdictional requirement); *see also Barrie-Peter Pan Schools, Inc. v. Cudmore,* 261 Md. 408, 411, 417, 276 A.2d 74 (1971) (court cannot exercise jurisdiction over a person, even though the person is subject to jurisdiction, unless he receives notice, by proper summons, and an opportunity to be heard).  Since she was not a party to the suit, final judgment could not have been validly entered against Ms. Hipple, North at 217–18, we have no jurisdiction to review any claim by her on appeal.  Md.Cts. & Jud.Proc.Code Ann., §§ 12–301, 308 (1981).  *Tidewater Ins. v. Dryden Oil Co.,* 42 Md.App. 415, 401 A.2d 178 (1979).

The cause of action arose from the partial immersion of the then two year old appellee in scalding water located in a hole which was excavated by employees of the defendant for the purpose of repairing a ruptured hot water line used to heat the apartment complex.

Appellants offered no evidence on their own behalf. Evidence produced by appellee showed that on July 19, 1978, because steam was observed rising out of the ground near one of the apartment buildings, Edgewater employees Robert Mulkern, who had been with Edgewater for one week and Gary Duncan, 16 years of age, were requested by their supervisor William Anders, to investigate the steam leak. Anders suspected that the leak was caused by a break in the pipe which carried heated water from the boiler to the apartment buildings.

After Mulkern and Duncan arrived at the scene of the leak they observed a puddle of steaming water. Anders then instructed them to get shovels and dig a hole beyond the puddle in order to find the suspected leak. Anders shut off the boiler which was about four feet away and then proceeded to repair a truck so the men would have transportation to the maintenance shop, a block from the scene, where he had directed them to obtain boards, ropes and stakes to cover and block off the hole. He had told them that after the hole was dug, they were to obtain the necessary materials and cover the hole. While Anders testified that he instructed the men not to leave the hole unattended, Mulkern did not refer to this instruction in his testimony.

After returning with the shovels and before they started digging, Mulkern warned several children, 5 to 7 years of age, to leave the area and play elsewhere. The children had been playing by placing their feet in the water, which had cooled somewhat by the time it reached the ground level. Mulkern also told some adults, who were nearby, to keep their children away from the hole.

By the time the two men found the leak, they had dug a hole approximately three feet wide by three feet deep. The hole had completely filled with water having a temperature of approximately 180 degrees Fahrenheit.

Before leaving the scene to obtain the materials for securing the hole, Mulkern obtained a "5-foot by 2-inches" (probably two feet) piece of plywood from a nearby window well and placed this over the hole. The plywood covered approximately two-thirds of the opening. When the two left the hole unattended, Mulkern did not see any children in the area.

Because Anders had not yet repaired the truck, the two men had to walk to the maintenance shop. Ropes and stakes were not available at the shop, but they did obtain a large piece of plywood which they carried back to the hole. This took about fifteen to twenty minutes.

When they returned to the hole, Mulkern saw appellee being pulled from the scalding water by eleven year old Erik Dentz. Appellee's skin was "red" and "hot" and appeared to be "falling off." Erik testified that he did not see any covering over the hole when he pulled appellee out of the water. Prior to hearing appellee scream, Erik had seen appellee playing with other children about fifteen feet from the hole. After appellee's mother arrived at the scene and took appellee for treatment, Mulkern and Duncan placed the plywood over the opening and covered it with dirt. Later, the hole was barricaded. Appellee suffered severe burns requiring extensive medical treatment.

Appellant Medina testified that "from the head office we had a safety program," but that he could not testify whether the property manager implemented the program. Anders, however, testified that there was no safety program at Edgewater.

Appellants raise three issues:

I. Whether the trial court erred in denying appellants' motion raising preliminary objection based on improper venue;

II. Whether the court should have granted appellants' motion for directed verdict on the basis of lack of evidence as to how appellee got into the water;

III. Whether it was error to permit the jury to consider the issue of punitive damages.

## I.

### *Venue*

■ Appellants each filed preliminary objections to appellee's declaration,[2] asserting, *inter alia*, that Baltimore City was an improper venue for the action. Appellants alleged that they did not reside or carry on business in Baltimore City and that the alleged tortious conduct did not happen in Baltimore City. The court denied the motions. We find no error in this ruling.

The general rule regarding venue is that "a civil action shall be brought where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation." Md.Cts. & Jud.Proc. § 6–201(a). Section 6–201(a) is "[s]ubject to the provisions of" § 6–202, however, which provides:

> *In addition* to the venue provided in § 6–201 ... the following actions may be brought in the indicated county:
>
> (3) Action against a corporation which has no principal place of business in the State-where the plaintiff resides.
>
> .    .    .    .    .
>
> (11) Action for damages against a *nonresident* individual-any county in the State.

(emphasis added).

At the time the action was instituted, appellee resided in Baltimore City and appellant United Princeton Properties, Inc. had no principal place of business in Maryland. Under § 6–202(3), venue was proper as to this corporate appellant.

---

2. Former Maryland Rule 323, new Rule 2–322.

None of the individual defendants were Maryland residents.[3] Under § 6-202(11) the nonresident defendants could be sued in "any county" in the State.[4] Since "any county" includes Baltimore City, M.R.P. 1-202(b), venue was proper.

## II.

### Directed Verdict

At the close of all the evidence, appellants moved for a directed verdict[5] on two grounds: (1) that since there was no evidence on how appellee ended up in the hole, there was insufficient evidence that appellants' negligence, if any, was the proximate cause of appellee's injuries; and (2) that there was insufficient evidence, as a matter of law, to warrant an award of punitive damages. The motions were denied.

We note at the outset that "[A] party is not entitled to a directed verdict in his favor unless the facts and circumstances permit of only one inference with regard to the issue presented." *Snoots v. Demorest*, 254 Md. 572, 575, 255 A.2d 12 (1969) (quoting *Smack v. Jackson*, 238 Md. 35, 37, 207 A.2d 511 (1965)). If appellee presented "any legally relevant and competent evidence, *however slight*, from which a rational mind could infer a fact in issue, then a trial court invade[s] the province of the jury," if it grants a directed verdict. *Plitt v. Greenberg*, 242 Md. 359, 368, 219 A.2d 237 (1966) (emphasis in original); *Gleason v. Jack Alan Enterprises*, 36 Md.App. 562, 565, 374 A.2d 408 (1977).

---

**3.** See 242, footnote 1.

**4.** The venue subtitle does not specifically address proper venue for suit against an unincorporated association. We need not address this issue, since appellee did not sue the Edgewater Equity Ltd. as a partnership entity. Cts. & Jud.Proc. § 6-406. Rather, appellee chose to sue the nonresident defendants as individual co-partners in the entity.

**5.** Former Rule 552, New Rule 2-519.

Appellants first contend that there was insufficient evidence from which a jury could infer that appellants' negligence was the proximate cause of appellee's injuries because appellee offered no evidence indicating how he landed in the hole. While negligence is not actionable unless it is the proximate cause of the plaintiff's injury, *Traish v. Hasan,* 245 Md. 489, 495, 226 A.2d 573 (1967); *Proctor Electric Co. v. Zink,* 217 Md. 22, 30, 141 A.2d 721 (1958), "[t]he determination of proximate cause is not a scientific process or one guided by legal abstractions." *Jubb v. Ford,* 221 Md. 507, 513, 157 A.2d 422 (1960).

▮ It is generally held that negligence is the proximate cause of an injury when the injury is the natural and probable result or consequence of the negligent act or omission. *Elkton Auto Sales Corp. v. State, to use of Ferry,* 53 F.2d 8, 11 (4th Cir.1931); *Bloom v. Good Humor Ice Cream Co.,* 179 Md. 384, 387, 18 A.2d 592 (1941). The test is whether the injury sustained was that which was reasonably foreseeable, in light of the surrounding circumstances. *Campbell v. State, to use of Dix,* 203 Md. 338, 346, 100 A.2d 798 (1954); *Dalmo Sales of Wheaton v. Steinberg,* 43 Md.App. 659, 672–3, 407 A.2d 339 *cert. denied,* 286 Md. 745 (1979). It is equally correct, however, that proximate cause must "be decided in a common-sense fashion in light of the attendant facts and circumstances, and, unless the facts are undisputed and admit of but one inference, the question is for the jury." *Jubb v. Ford,* 221 Md. at 513, 157 A.2d 422; *Campbell,* 203 Md. at 346, 100 A.2d 798; *Suburban Trust Co. v. Waller,* 44 Md.App. 335, 347, 408 A.2d 758 (1979). The court should not indulge in refinements and subtleties as to causation which would defeat the ends of justice. *Mullan v. Hacker,* 187 Md. 261, 269, 49 A.2d 640 (1946); *Industrial Service Co. v. State, to use of Bryant,* 176 Md. 625, 638, 6 A.2d 372 (1939).

▮ Applying these principles, we hold that the issue of proximate cause was properly submitted to the jury. Appellee presented evidence, not only that appellants' created

a dangerous situation, but that they created it in the presence of young children and left it unattended, all with notice that the children were attracted to the water. Whether appellants should have foreseen that a child would end up in the water filled hole was a question of fact for the jury to resolve.

Appellants maintain, however, that appellee could have been pushed into the water by another, or jumped into the hole of his own volition. Appellants presented absolutely no evidence of either fact.[6] We agree with appellee that appellants' reliance on the absence of direct evidence as to how appellee ended up in the hole is no more than a "red herring." During oral argument, appellant virtually conceded their issue.

## III.

### Punitive Damages

In addition to $400,000.00 in compensatory damages, the jury awarded appellee $300,000.00 in punitive damages. Appellants' final contention is that because the evidence was insufficient, the jury should not have been permitted to consider the issue of punitive damages. Punitive damages may be recovered in negligence actions without proof "of *actual intent* to injure or *actual malice*" provided that there is on the part of the defendant such extraordinary or outrageous conduct as to amount to the possible legal

---

**6.** Moreover, the subsequent negligent act of a third person would not necessarily relieve appellants of liability if the jury concluded that such an act was reasonably foreseeable and that appellants' negligence was an essential link in the chain of causation, *see Mehlman v. Powell,* 281 Md. 269, 275–6, 378 A.2d 1121 (1977); *see generally,* Foreseeable Intervening Negligence Not A Superseding Cause, 21 Md.L.Rev. 68 (1961). In addition, even if appellee, two years old at the time, jumped into the hole, he would not be held legally responsible for contributory negligence. *Mulligan v. Pruitt,* 244 Md. 338, 346, 223 A.2d 574 (1966). Where the defendant's negligence combines with the plaintiff's non-culpable act to cause an injury, the defendant is nevertheless liable. *American Oil Co. v. Wells,* 164 Md. 422, 430, 165 A. 298 (1933).

equivalent of actual intent or actual malice; also described as the wanton, reckless disregard for the rights of others. *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 165–6, 297 A.2d 721 (1972). Within the context of the operation of a motor vehicle, the latter conduct, assuming the actor's knowledge of the dangers and risks involved, has been described as "the legal equivalent of malice," and which stops "just short of wilful or intentional injury" but, nonetheless "is of an extraordinary or outrageous character." *Id.* p. 168, 297 A.2d 721. *See American Laundry Mach. v. Horan*, 45 Md.App. 97, 113–16, 412 A.2d 407 (1980) (products liability-negligence amounting to reckless indifference to the rights of others warrants award of punitive damages). *See Wedeman v. City Chevrolet Co.*, 278 Md. 524, 532–3, 366 A.2d 7 (1976) (contract case—fraudulent misrepresentation, award of punitive damages affirmed); *Baltimore Transit Co. v. Faulkner*, 179 Md. 598, 602, 20 A.2d 485 (1941) (wanton conduct is characterized by extreme violence, recklessness and utter disregard for the rights of others); *see also Conklin v. Schillinger*, 255 Md. 50, 70–77, 257 A.2d 187 (1969) (in dicta the court expressed agreement with the foregoing).

■ As we noted previously, our review in this case is whether appellee presented any legally relevant and competent evidence which generated punitive damages as an issue to be decided by the jury. *Plitt v. Greenberg*, 242 Md. 359, 219 A.2d 237 (1966); *Gleason v. Jack Alan Enterprises*, 36 Md.App. 562, 374 A.2d 408 (1977). Could a rational mind infer from the evidence that appellants acted in such an extraordinary or outrageous manner so that their actions amounted to a wanton, reckless disregard for the appellee's rights? The words "wanton" and "reckless" have been used in conjunction with "wilful" to such an extent that distinctions among them have been consistently ignored and

... The usual meaning assigned to 'willful,' 'wanton,' or 'reckless,' ... is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it

highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. Since, however, it is almost never admitted, and can be proved only by the conduct and the circumstances, an objective standard must of necessity in practice be applied. The 'willful' requirement, therefore, breaks down and receives at best lip service, where it is clear from the facts that the defendant, whatever his state of mind, has proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position.

The result is that 'willful,' 'wanton,' or 'reckless' conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. As a result there is often no clear distinction at all between such conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning, of an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care. It is at least clear, however, that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simple inattention, . . .

Prosser and Keeton, *Law of Torts,* 834 pp. 212–214 (3rd ed. 1984) (footnotes omitted). Although there is no special duty where young children are involved, there may be a higher degree of care when compared with that degree required to adults. *State v. Fidelity Warehouse Co.,* 176 Md. 341, 346–7, 4 A.2d 739 (1939); *see also Wheeler Terrace, Inc. v. Lynott,* 234 A.2d 311 (D.C.App.1967) (jury award of damages, based on simple negligence, to a seven year old against owner of apartment complex affirmed). A higher degree of care is required when dealing with a known dangerous instrumentality, such as the scalding water in this case. *See generally* Prosser and Keeton, *Law of Torts,* § 34, pp. 208–214 (5th, ed., 1984).

█ In the case *sub judice,* the evidence showed that Anders, charged with the responsibility of maintaining the Edgewater Apartment complex, sent two young and inexperienced workers to dig a hole where 180 degree water was leaking. Although Anders shut off the flow, he was aware that the hot water would stay in the system. As the two workers dug the hole, they watched it fill with scalding water, knowing that children had been attracted to it earlier.

Based on the evidence produced at trial, the appellants were charged with knowledge that the hole had filled with scalding water; that the truck Anders had attempted to repair to transport the material to secure the hole was not available and, therefore, the employees would have to walk to the supply depot to obtain the materials; that the hole which had filled with scalding water would be left unguarded; that in the area there were children who were not only attracted to the water, but had in fact played in it when it was cooler; and that the hole had been only partially secured. Also, there was the evidence regarding the availability of safety procedures which appellants had neither adopted nor implemented.

It is clear that the actions of appellants amounted to negligence, but, based on the standards set out in the cited cases in the *Law of Torts,* both *supra,* we must decide whether that is "an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care" and is "more than any mere mistake resulting in inexperience, excitement, or confusion . . .; more than mere thoughtlessness or inadvertence, or simple inattention." *Law of Torts.*

The quantity of the negligence in this case does not change the quality of that negligence so that it becomes different from ordinary lack of care. We hold that the conduct of appellants in this case, while clearly negligent, was not so extraordinary or outrageous as to raise that

**252**

conduct to the qualitative level necessary to establish a foundation for the award of punitive damages.

JUDGMENT AS TO COMPENSATORY DAMAGES AFFIRMED; REVERSED AS TO PUNITIVE;

COSTS TO BE EQUALLY DIVIDED BETWEEN APPELLANTS AND APPELLEE.